Case: 12-1343   Document: 1-1   Filed: 02/15/2012   Pages: 13

**12-1343**

## IN THE UNITED STATES COURT OF APPEALS
### FOR THE SEVENTH CIRCUIT

SIERRA CLUB )
)
    Petitioner, )
)
v. )
)
UNITED STATES ENVIRONMENTAL )
PROTECTION AGENCY, and )
)
LISA P. JACKSON, )
   Administrator, United States )
   Environmental Protection Agency, )
)
    Respondents. )

*12-3420*

**PETITION FOR REVIEW**

Docket No.

U.S.C.A. – 7th Circuit
F I L E D

FEB 15 2012

GINO J. AGNELLO
CLERK

Pursuant to the Clean Air Act § 307(b)(1), 42 U.S.C. §7607(b)(1), Sierra Club hereby petitions the Court for review of the final action taken by respondents United States Environmental Protection Agency ("EPA") and its Administrator, Lisa P. Jackson ("the Administrator"), entitled "Approval and Promulgation of Implementation Plans and Designation of Areas for Air Quality Planning Purposes; Ohio and Indiana; Redesignation of the Ohio and Indiana Portions of the Cincinnati-Hamilton 1997 Annual Fine Particulate Matter Nonattainment Area to Attainment." EPA assigned this action Docket numbers EPA-R05-OAR-2011-0017 and EPA-R05-OAR-2011-0106.

The final action was dated December 14, 2011, and notice was published in the Federal Register on December 23, 2011. 76 Fed. Reg. 80,253 (Dec. 23, 2011). The decision negatively impacts Sierra Club's members because it results in more air pollution being emitted into the air breathed by Sierra Club members than allowed by law, and because it results in deficient monitoring and reporting of air pollution information that Sierra Club and its members use to inform themselves of pollution.

1

This Court has jurisdiction to review the Administrator's final action pursuant to 42

U.S.C. 5 7607(b)(1). It has been fewer than 60 days since notice of Respondents' final action

appeared in the Federal Register. 76 Fed. Reg. at 80,260 ("Under section 307(b)(l) of the CAA,

petitions for judicial review of this action must be filed in the United States Court of Appeals for

the appropriate circuit by February 21, 2012."). Venue is proper in this Court because this is a

challenge to a final action that is locally applicable to Indiana as well as Ohio. 42 U.S.C.

§7607(b)(l).

DATED: February 14, 2012

Respectfully submitted,

MCGILLIVRAY WESTERBERG & BENDER LLC

David C. Bender

David C. Bender
Christa O. Westerberg
Pamela R. McGillivray
211 S. Paterson Street, Ste 320
Madison, WI 53703
Tel. 608.310.3560
Fax 608.310.3561
Email: bender@mwbattorneys.com

Counsel for Sierra Club

## CERTIFICATE OF SERVICE

On February 14, 2012, I caused to be served upon the following persons the foregoing Petition for Review by Certified United States Mail, Return Receipt Requested:

Lisa P. Jackson
United States Environmental Protection Agency
Ariel Rios Building
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460

David C. Bender

direct effect on one or more Indian tribes, on the relationship between the Federal Government and Indian tribes, or on the distribution of power and responsibilities between the Federal Government and Indian tribes.

**Energy Effects**

We have analyzed this rule under Executive Order 13211, Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use. We have determined that it is not a "significant energy action" under that order because it is not a "significant regulatory action" under Executive Order 12866 and is not likely to have a significant adverse effect on the supply, distribution, or use of energy. The Administrator of the Office of Information and Regulatory Affairs has not designated it as a significant energy action. Therefore, it does not require a Statement of Energy Effects under Executive Order 13211.

**Technical Standards**

The National Technology Transfer and Advancement Act (NTTAA) (15 U.S.C. 272 note) directs agencies to use voluntary consensus standards in their regulatory activities unless the agency provides Congress, through the Office of Management and Budget, with an explanation of why using these standards would be inconsistent with applicable law or otherwise impractical. Voluntary consensus standards are technical standards (e.g., specifications of materials, performance, design, or operation; test methods; sampling procedures; and related management systems practices) that are developed or adopted by voluntary consensus standards bodies.

This rule does not use technical standards. Therefore, we did not consider the use of voluntary consensus standards.

**Environment**

We have analyzed this rule under Department of Homeland Security Management Directive 023–01 and Commandant Instruction M16475.lD, which guide the Coast Guard in complying with the National Environmental Policy Act of 1969 (NEPA) (42 U.S.C. 4321–4370f), and have made a determination that this action is one of a category of actions which do not individually or cumulatively have a significant effect on the human environment. This rule is categorically excluded, under figure 2–1, paragraph (34)(g), of the Instruction. This regulation establishes one security zone. A final "Environmental Analysis Check List" and a final "Categorical

Exclusion Determination" are available in the docket where indicated under **ADDRESSES.**

**List of Subjects in 33 CFR Part 165**

Harbors, Marine security, Navigation (water), Reporting and recordkeeping requirements, Security measures, and Waterways.

For the reasons discussed in the preamble, the Coast Guard amends 33 CFR part 165 as follows:

**PART 165—REGULATED NAVIGATION AREAS AND LIMITED ACCESS AREAS**

■ 1. The authority citation for part 165 continues to read as follows:

Authority: 33 U.S.C. 1226, 1231; 46 U.S.C. Chapter 701; 50 U.S.C. 191, 195; 33 CFR 1.05–1, 6.04–1, 6.04–6, and 160.5; Pub. L. 107–295, 116 Stat. 2064; Department of Homeland Security Delegation No. 0170.1.

■ 2. Add § 165.T14–215 to read as follows:

**§ 165.T14–215  Security Zone; On the Waters in Kailua Bay, Oahu, HI.**

(a) *Location.* The following area, within the Honolulu Captain of the Port Zone (See 33 CFR 3.70–10), from the surface of the water to the ocean floor is a temporary security zone: All waters in Kailua Bay to the west of a line beginning at Kapoho Point and thence southwestward at a bearing of 222° (true) to the shoreline at Namala Place road; as well as the nearby channel from its entrance at Kapoho Point to a point 150-yards to the southwest of the N. Kalaheo Avenue Road Bridge. This zone extends from the surface of the water to the ocean floor. This zone will include the navigable waters of the channel beginning at point 21°24′56″ N, 157°44′58″ W, then extending to 21°25′26″ N, 157°44′21″ W (Kapoho Point) including all the waters to the west of a straight line to 21°24′58″ N, 157°44′35″ W (Namala Place), and then extending back to the original point 21°24′56″ N, 157°44′58″ W.

(b) *Effective period.* This section is effective from 6 a.m. HST on December 21, 2011, through 8 p.m. HST on January 7, 2012.

(c) *Regulations.* The general regulations governing security zones contained in 33 CFR 165.33, subpart D, apply to the security zone created by this temporary final rule.

(1) All persons are required to comply with the general regulations governing security zones found in 33 CFR part 165.

(2) Entry into or remaining in this zone is prohibited unless authorized by the Coast Guard Captain of the Port Honolulu.

(3) Persons desiring to transit the security zones identified in paragraph (a) of this section may contact the Captain of the Port at Command Center telephone number (808) 842–2600 and (808) 842–2601, fax (808) 842–2624 or on VHF channel 16 (156.8 Mhz) to seek permission to transit the zones. If permission is granted, all persons and vessels must comply with the instructions of the Captain of the Port Honolulu or his designated representative and proceed at the minimum speed necessary to maintain a safe course while within the zone.

(4) The U.S. Coast Guard may be assisted in the patrol and enforcement of the zones by Federal, State, and local agencies.

(d) *Notice of enforcement.* The Captain of the Port Honolulu will cause notice of the enforcement of the security zone described in this section to be made by verbal broadcasts and written notice to mariners and the general public.

(e) *Definitions.* As used in this section, *designated representative* means any Coast Guard commissioned, warrant, or petty officer who has been authorized by the Captain of the Port Honolulu to assist in enforcing the security zones described in paragraph (a) of this section.

Dated: December 12, 2011.

J.M. Nunan,

*CAPT, U.S. Coast Guard, Captain of the Port Honoluln.*

[FR Doc. 2011–33017 Filed 12–22–11; 8:45 am]

BILLING CODE 9110-04-P

**ENVIRONMENTAL PROTECTION AGENCY**

**40 CFR Parts 52 and 81**

[EPA–R05–OAR–2011–0017; EPA–R05–OAR–2011–0106; FRL–9610–3]

**Approval and Promulgation of Implementation Plans and Designation of Areas for Air Quality Planning Purposes; Ohio and Indiana; Redesignation of the Ohio and Indiana Portions of the Cincinnati-Hamilton 1997 Annual Fine Particulate Matter Nonattainment Area to Attainment**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule.

**SUMMARY:** EPA is approving, under the Clean Air Act (CAA), Ohio's and Indiana's requests to redesignate their respective portions of the Cincinnati-Hamilton nonattainment area (for Ohio: Butler, Clermont, Hamilton, and Warren

**80254** Federal Register / Vol. 76, No. 247 / Friday, December 23, 2011 / Rules and Regulations

Counties, Ohio; for Indiana: a portion of Dearborn County) to attainment for the 1997 annual National Ambient Air Quality Standard (NAAQS or standard) for fine particulate matter ($PM_{2.5}$). The Ohio Environmental Protection Agency (Ohio EPA) submitted its request on December 9, 2010, and the Indiana Department of Environmental Management (IDEM) submitted its request on January 25, 2011. EPA's approvals here involve several additional related actions. EPA has determined that the entire Cincinnati-Hamilton area has attained the 1997 annual $PM_{2.5}$ standard. EPA is approving, as revisions to the Ohio and Indiana State Implementation Plans (SIPs), the states' plans for maintaining the 1997 annual $PM_{2.5}$ NAAQS through 2021 in the area. EPA is approving the 2005 emissions inventories for the Ohio and Indiana portions of the Cincinnati-Hamilton area as meeting the comprehensive emissions inventory requirement of the CAA. Finally, EPA finds adequate and is approving Ohio and Indiana's Nitrogen Oxides ($NO_X$) and $PM_{2.5}$ Motor Vehicle Emission Budgets (MVEBs) for 2015 and 2021 for the Cincinnati-Hamilton area.

**DATES:** *Effective Date:* This rule will be effective December 23, 2011.

**ADDRESSES:** EPA has established two dockets for this action under Docket Identification EPA–R05–OAR–2011–0017 and EPA–R05–OAR–2011–0106, containing identical material but nominally addressing Ohio's and Indiana's submittals, respectively. All documents in these dockets are listed on the *www.regulations.gov* Web site. Although listed in the index, some information is not publicly available, e.g., CBI or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, will be publicly available only in hard copy. Publicly available docket materials are available either electronically in *www.regulations.gov* or in hard copy at the U.S. Environmental Protection Agency, Region 5, Air and Radiation Division, 77 West Jackson Boulevard, Chicago, Illinois 60604. This facility is open from 8:30 a.m. to 4:30 p.m., Monday through Friday, excluding Federal holidays. We recommend that you telephone Carolyn Persoon at (312) 353–8290 before visiting the Region 5 office.

**FOR FURTHER INFORMATION CONTACT:** Carolyn Persoon, Environmental Engineer, Control Strategies Section, Air Programs Branch (AR–18J), Environmental Protection Agency, Region 5, 77 West Jackson Boulevard,

Chicago, Illinois 60604, (312) 353–8290, *persoon.carolyn@epa.gov.*

**SUPPLEMENTARY INFORMATION:** Throughout this document whenever "we," "us," or "our" is used, we mean EPA. This supplementary information section is arranged as follows:

I. What is the background for the actions?
II. What are the actions EPA is taking?
III. What is EPA's response to comments?
IV. Why is EPA taking these actions?
V. Final Action
VII. Statutory and Executive Order Reviews

## I. What is the background for the actions?

The Ohio EPA submitted its request on December 9, 2010, and IDEM submitted its request on January 25, 2011, to redesignate their respective portions of the Cincinnati-Hamilton nonattainment area to attainment for the 1997 annual $PM_{2.5}$ NAAQS, and for EPA approval of both states' SIP revisions containing maintenance plans for the area. In an action published on October 19, 2011 (76 FR 64825), EPA proposed approval of Ohio and Indiana's plans for maintaining the 1997 annual $PM_{2.5}$ NAAQS, including the emissions inventories submitted pursuant to CAA section 172(c)(3); and the $NO_X$ and $PM_{2.5}$ MVEBs for the Ohio and Indiana portions of the Cincinnati-Hamilton area as contained in the maintenance plan. Additional background for today's action is set forth in EPA's October 19, 2011, notice of direct final rulemaking, which EPA withdrew on December 6, 2011, following receipt of adverse comments.

## II. What are the actions EPA is taking?

EPA has determined that the entire Cincinnati-Hamilton area is attaining the 1997 annual $PM_{2.5}$ standard (76 FR 60373) and that the Ohio and Indiana portions of the area have met the requirements for redesignation under section 107(d)(3)(E) of the CAA. Thus, EPA is approving the requests from the states of Ohio and Indiana to change the legal designation of their portions of the Cincinnati-Hamilton area from nonattainment to attainment for the 1997 annual $PM_{2.5}$ NAAQS. This action does not address the Kentucky portion of the Cincinnati-Hamilton area. EPA is also taking several additional actions related to Ohio's and Indiana's $PM_{2.5}$ redesignation requests, as discussed below.

EPA is approving Indiana's and Ohio's $PM_{2.5}$ maintenance plans for the Cincinnati-Hamilton area as revisions to the Ohio and Indiana SIP (such approval being one of the CAA criteria for redesignation to attainment status). The maintenance plans are designed to

keep the Cincinnati-Hamilton area in attainment of the 1997 annual $PM_{2.5}$ NAAQS through 2021.

EPA is approving 2005 emissions inventories for primary $PM_{2.5}$,[1] $NO_X$, and sulfur dioxide ($SO_2$),[2] documented in Ohio's and Indiana's $PM_{2.5}$ redesignation request submittals. These emissions inventories satisfy the requirement in section 172(c)(3) of the CAA for a comprehensive, current emission inventory.

Finally, EPA finds adequate and is approving Ohio's and Indiana's 2015 and 2021 primary $PM_{2.5}$ and $NO_X$ MVEBs for the Cincinnati-Hamilton area. These MVEBs will be used in future transportation conformity analyses for the area. Further discussion of the basis for these actions is provided below.

## III. What is EPA's response to comments?

EPA received two sets of comments submitted by Robert Ukeiley on behalf of Sierra Club: The first set, dated October 19, 2011, and the second set dated November 18, 2011. A summary of the comments and EPA's responses are provided below.

*Comment 1a:* The comment contends that it is inappropriate for EPA to redesignate these areas to attainment at this time, claiming that EPA is illegally delaying issuing a final rule to revise the annual $PM_{2.5}$ NAAQS, and that EPA's Clean Air Science Advisory Committee (CASAC) has recommended adoption of a lower NAAQS. The Commenter alleges that EPA is removing the protection of a scientifically inadequate NAAQS, while not adopting a more protective standard.

*Response 1a:* This redesignation does not remove the protection of the 1997 annual $PM_{2.5}$ NAAQS. This redesignation does not concern the new NAAQS, addresses only the 1997 annual $PM_{2.5}$ NAAQS, and has no impact on EPA's actions with respect to a revised NAAQS.

*Comment 1b:* The Commenter claims that "EPA has failed to conduct an adequate analysis under Clean Air Act Section 110(l) on what effect redesignation will have on the 2006 24-hour $PM_{2.5}$ NAAQS, the 1-hour $NO_X$ NAAQS, the 1-hour $SO_2$ NAAQS and the 1997 and 2008 75 parts per billion ozone NAAQS." In subsequent comments, the Commenter also states,

[1] Fine particulates directly emitted by sources and not formed in a secondary manner through chemical reactions or other processes in the atmosphere.

[2] $NO_X$ and $SO_2$ are precursors for fine particulates through chemical reactions and other related processes in the atmosphere.

"EPA has not conducted an adequate analysis of the effect redesignation will have on other National Ambient Air Quality Standards".

*Response 1b:* Section 110(l) provides in part: "the Administrator shall not approve a revision of a plan if the revision would interfere with any applicable requirement concerning attainment and reasonable further progress * * *, or any other applicable requirement of this chapter." As a general matter, EPA must and does consider section 110(l) requirements for every SIP revision, including whether the revision would "interfere with" any applicable requirement. *See, e.g.,* 70 FR 53, 57 (January 3, 2005); 70 FR 17029, 17033 (April 4, 2005); 70 FR 28429, 28431 (May 18, 2005); and 70 FR 58119, 58134 (October 5, 2005). Neither Ohio's nor Indiana's redesignation request and maintenance plan for the 1997 annual PM$_{2.5}$ NAAQS revises or removes any existing emissions limit for any NAAQS, nor does it alter any existing control requirements. On that basis, EPA concludes that the redesignations will not interfere with attainment or maintenance of any of these air quality standards. The Commenter does not provide any information in its comment to indicate that approval of these redesignations would have any impact on the Area's ability to comply with on the 2006 24-hour PM$_{2.5}$ NAAQS, the 1-hour NO$_2$ NAAQS, the 1-hour SO$_2$ NAAQS or the 1997 8-hour ozone NAAQS and 2008 75 parts per billion ozone NAAQS. In fact, the maintenance plans provided with both states' submissions demonstrate a decline in the direct PM$_{2.5}$ and PM$_{2.5}$ precursor emissions over the timeframe of the initial maintenance period. As a result, the redesignations do not relax any existing rules or limits, nor will the redesignation alter the status quo air quality.[3] The Commenter has not explained why the redesignation might interfere with attainment of any standard or with satisfaction of any other requirement, and EPA finds no basis under section 110(l) for EPA to disapprove the SIP revision at issue or to redesignate the area as requested.

*Comment 1c:* The Commenter elaborates on the first comment in the second set of comments submitted, claiming "For example, but this is only one example, as explained below the

Ohio and Indiana SIPs do not currently have Reasonable Available Control Technology (RACT) standards in place for PM$_{2.5}$. Implementing these RACT standards would have reduced NO$_X$ and SO$_2$ which would have a co-benefit of helping with the 2006 24-hour PM$_{2.5}$ NAAQS, the 1-hour NO$_X$ NAAQS, the 1-hour SO$_2$ NAAQS, and the 1997 and 2008 ozone NAAQS as well as visibility. EPA needs to demonstrate that removing this co-benefit will not interfere with attainment, reasonable further progress and any other applicable requirement."

*Response 1c:* This example is fallacious, for reason given in response 6(b) below—no RACT is required because the area is attaining the standard.

*Comment 2a:* The Commenter argues that EPA has not established that any of the emission reductions did not come from the NO$_X$ SIP Call, CAIR (the Clean Air Interstate Rule), and CSAPR (the Cross-State Air Pollution Rule, also known as the Transport Rule).

*Response 2a:* EPA disagrees with the Commenter's assertion. EPA and the states have shown that emission reductions arose both from the transport regulations listed above and from other regulatory requirements. The Cincinnati-Hamilton area contains various sources of emissions (point source, area, and mobile), and emission reductions from the nonattainment year of 2005 to the attainment year of 2008 are attributed to many permanent and enforceable measures. The NO$_X$ SIP Call, CAIR, and CSAPR are all measures that have resulted in emission reductions from point source Electric Generating Units (EGUs). In addition, emission reduction from mobile sources, which account for 53% of NO$_X$ emissions and 58% of direct PM$_{2.5}$ for the nonattainment year of 2005, are attributed to permanent and enforceable engine and fuel standards. Due to these permanent and enforceable measures, mobile sources reduced their emissions by 9,367 tons of NO$_X$ and 792 tons of direct PM$_{2.5}$ between the years of 2005 to 2008.

*Comment 2b.* The Commenter asserts that emission reductions pursuant to NO$_X$ SIP Call, CAIR and CSAPR programs are not permanent and enforceable because these programs are cap and trade programs. The Commenter further opines that any source which reduced its actual emissions pursuant to one of these programs could at any time in the future choose to increase their emissions by purchasing emission credits.

*Response 2b.* Contrary to the Commenter's statement, EPA did

establish in the proposal notice that at least part of the emission reductions that helped the area achieve attainment came from programs other than the NO$_X$ SIP Call, CAIR and CSAPR. The notice lists several permanent and enforceable reductions in emissions resulting from implementation of the Ohio and Indiana SIPs, applicable Federal air pollution control regulations, and other reductions that are not "cap and trade" programs. Those programs include Tier 2 vehicle standards, heavy-duty gasoline and diesel highway vehicle standards, nonroad spark-ignition engines and recreational engines standards, large nonroad diesel engine standards, open burning bans, and fugitive emissions standards. *See* 76 FR 65465.

Further, EPA disagrees with the Commenter's conclusion that emission reductions associated with trading programs such as the NO$_X$ SIP Call, CAIR, and CSAPR are not permanent and enforceable simply because the underlying program is an emissions trading program. The Commenter appears to be arguing that these reductions cannot be considered permanent and enforceable within the meaning of section 107(d)(3)(E)(iii) of the CAA. This section 107(d)(3)(E)(iii) requires that, in order to redesignate an area to attainment, the Administrator must determine that "the improvement in air quality is due to permanent and enforceable reductions in emissions resulting from implementation of the applicable SIP and applicable federal air pollutant control regulations and other permanent and enforceable reductions." EPA disagrees with the Commenter's conclusion that reductions from trading programs can't be considered permanent and enforceable because these programs allow individual sources to choose between purchasing emission credits and reducing emissions.

The final CSAPR allows sources to trade allowances with other sources in the same or different states while firmly constraining any emissions shifting that may occur by requiring a strict emission ceiling in each state (the budget plus variability limit). As explained in EPA's proposed redesignation notice for the Ohio and Indiana portions of the Cincinnati-Hamilton area, the emission reduction requirements of CAIR are enforceable through the 2011 control period, and because CSAPR has now been promulgated to address the requirements previously addressed by CAIR and gets similar or greater reductions in the relevant areas in 2012 and beyond, EPA considers the emission reductions that led to attainment in the Cincinnati-Hamilton area to be permanent and enforceable.

---

[3] EPA notes that the Cincinnati/Northern Kentucky Area does not have violating monitors for the 2006 24-hour PM$_{2.5}$ NAAQS, the 1-hour NO$_X$ NAAQS, or the 1-hour SO$_2$ NAAQS, the 1-hour and 8-hour ozone NAAQS, and that this Area has never been designated nonattainment for 2006 24-hour PM$_{2.5}$ NAAQS, the 1-hour NO$_X$ NAAQS, or the 1-hour SO$_2$ NAAQS.

The emission ceilings within each state are a permanent requirement of the CSAPR and are made enforceable through the associated Federal Implementation Plans.

EPA responded to a similar comment in its "Approval and Promulgation of Air Quality Implementation Plans; Redesignation of the Evansville area to attainment of the Fine Particulate Matter Standard" 76 FR 59527, 59529/1, September 27, 2011. In that notice, EPA discusses several factors which support EPA's determination that the $SO_2$ reductions in the Evansville area are permanent and enforceable, and which also apply to the Cincinnati area. First, given the mandates under CSAPR, any utility that has already spent the hundreds of millions of dollars to install scrubbers will find continued effective operation of those controls to be far more cost-effective than disregarding this investment and either expending similar capital installing replacement scrubbers elsewhere or purchasing credits at a price equivalent to that capital already spent. In short, any utility in a state covered by CSAPR provisions related to $PM_{2.5}$ that has installed scrubbers is almost certain under CSAPR to retain the scrubbers and operate them effectively. Second, any action by a utility that increases its emissions, requiring the purchase of allowances, necessitates a corresponding reduction by the utility that sells the allowances. Given the regional nature of particulate matter, this corresponding emission reduction will have an air quality benefit that will compensate at least in part for the impact of any emission increase from utility companies outside but near the Cincinnati-Hamilton area. In accordance with the opinion of the Court of Appeals for the District of Columbia Circuit, CSAPR includes assurance provisions to ensure that the necessary emission reductions occur within each covered state.

The recent proposed rule revision referenced by the Commenter would amend the CSAPR assurance penalty provisions for all states within the program so they start in 2014 instead of 2012. 76 FR 63860, October 14, 2011. As explained in the proposal, which was subject to public review and comment, this revision would promote the development of allowance market liquidity, thereby smoothing the transition from the CAIR programs to the CSAPR programs in 2012.

Further, Ohio's and Indiana's maintenance plans provide for verification of continued attainment by performing future reviews of triennial emissions inventories and also for contingency measures to ensure that the NAAQS is maintained into the future if monitored increases in ambient $PM_{2.5}$ concentrations occur. 76 FR 64825. For this and the above reasons, EPA disagrees that the Commenter has identified a basis on which EPA should disapprove this SIP revision.

*Comment 3:* The Commenter asserts that "Emissions calculations for on-road mobile sources fail to consider 15% ethanol in gasoline."

*Response 3:* Ethanol 15 (E15) is not mandated by EPA. EPA granted a partial waiver for vehicles model years 2001 and newer, light duty vehicles (76 FR 4662) to be able to use E15. To receive a waiver under CAA section 211(f)(4), a fuel or fuel additive manufacturer must demonstrate that a new fuel or fuel additive will not cause or contribute to the failure of engines or vehicles to achieve compliance with the emission standards to which they have been certified over their useful life. Data used to act upon the approval of the E15 partial waiver showed that model year 2001 and newer vehicles would still meet their certified engine standards for emissions for both short and long term use, and use of E15 would not significantly increase the emission from these engines. EPA's partial waiver for E15 is based on extensive studies done by the Department of Energy, as well as the Agency's engineering assessment to determine the effects of exhaust and evaporative emissions for the fleet prior to the partial waiver. The criteria for granting the waiver was not that there are no emission impacts of E15, but rather that vehicles operating on it would not be expected to violate their emission standards in-use. As discussed in the waiver decision, there are expected to be some small emission impacts. E15 is expected to cause a small immediate emission increase in $NO_x$ emissions. However, due to its lower volatility than the E10 currently in-use, its use is also expected to result in lower evaporative VOC emissions. Any other emissions impacts related to E15 would be a result of misfueling of E15 in model year 2000 and older vehicles, and recreational or small engines. EPA has approved regulations dealing specifically with the mitigation of misfueling and reducing the potential increase in emissions from misfueling (76 FR 44406).

The partial waivers that EPA has granted to E15 do not require that E15 be made or sold. The waivers merely allow fuel or fuel additive manufacturers to introduce E15 into commerce if they meet the waivers' conditions. Other Federal, state and local requirements must also be addressed before E15 may be sold. The granting of the partial waivers is only one of several requirements for registration and distribution of E15.

Since E15 may never be used in Ohio and Indiana, and even if it is, due to the small and opposite direction of emission impacts of E15, the limited vehicle fleet which can use it, and the measures required to avoid mitigating misfueling, EPA believes that any potential emission impacts of E15 will be less than the maintenance plan safety margin by which Ohio and Indiana show maintenance.

*Comment 4a:* The Commenter contends that the "Ohio and Indiana maintenance plans will not provide for maintenance for ten years after the redesignation," based on the Commenter's belief that EPA will be unable to finalize its approval of the requests for redesignation by the end of 2011.

*Response 4a:* Since EPA has promulgated its approvals of the redesignation requests of Ohio and Indiana by the end of 2011, and the maintenance plans provide for maintenance through the end of 2021, it is evident that the Commenter's concern was misplaced, and that the maintenance plans do provide for a ten-year maintenance period in accordance with CAA section 175A.

*Commment 4b:* The Commenter asserts that the Ohio and Indiana maintenance plans are deficient in part because the contingency measures they include provide for their implementation within 18 months of a monitored violation, if one occurs. The Commenter claims that as a consequence, the "contingency measures do not provide for prompt correction of violations."

*Response 4b:* The Commenter overlooks the provisions of the CAA applicable to contingency measures. Section 175A(d) provides that "[e]ach plan revision submitted under this section shall contain such contingency provisions as *the Administrator deems necessary* to assure that the state will promptly correct any violation of the standard which occurs after the redesignation of the area as an attainment area." (emphasis added). Thus Congress gave EPA discretion to evaluate and determine the contingency measures EPA "deems necessary" to assure that the state will promptly correct any subsequent violation. EPA has long exercised this discretion in its rulemakings on section 175A contingency measures in redesignation maintenance plans, allowing as contingency measures commitments to adopt and implement in lieu of fully

adopted contingency measures, and finding that implementation within 18 months of a violation complies with the requirements of section 175A. See recent redesignations, e.g. Indianapolis PM$_{2.5}$ annual standard (76 FR 59512), Lake and Porter 8-hour ozone standard (75 FR 12090), and Northwest Indiana PM$_{2.5}$ annual standard (76 FR 59600). Section 175A does not establish any deadlines for implementation of contingency measures after redesignation to attainment. It also provides far more latitude than does section 172(c)(9), which applies to a different set of contingency measures applicable to nonattainment areas. Section 172(c)(9) contingency measures must "take effect * * * without further action by the State or [EPA]." By contrast, section 175A confers upon EPA the discretion to determine what constitutes adequate assurance, and thus permits EPA to take into account the need of a state to assess, adopt implement contingency measures if and when a violation occurs after an area's redesignation to attainment. Therefore, in accordance with the discretion accorded it by statute, EPA may allow reasonable time for states to analyze data and address the causes and appropriate means of remedying a violation. In assessing what "promptly" means in this context, EPA also may take into account time for adopting and implementation of the appropriate measure. In the case of the Cincinnati-Hamilton area, EPA reasonably concluded that, 18 months constitutes a timeline consistent with prompt correction of a potential monitored violation. This timeframe also conforms with EPA's many prior rulemakings on acceptable schedules for implementing section 175A contingency measures.

*Comment 4c:* The Commenter asserts that the contingency measures contained in the maintenance plans are "too vague".

*Response 4c:* As discussed above in response to comment 4(b), the CAA does not specify the requisite nature, scope, specificity, or number of contingency measures to be included in a maintenance plan under section 175A. It is for EPA to determine whether the state has given adequate assurance that it can promptly correct a violation. Both Ohio and Indiana have submitted contingency measures that EPA deems adequate. They have committed to remedy a future violation, and have included measures to address potential violations from a range of sources and a timeline for promptly completing adoption and implementation. The states have identified measures that are sufficiently specific but which allow for

latitude in potential scope. This will enable the states to address a range of potential sources and differing degrees and types of violations. EPA believes that the contingency measures set forth in the submittal, combined with the states' commitment to an expeditious timeline and process for implementation, provide assurance that the states will promptly correct a future potential violation. Given the uncertainty as to timing, degree and nature of any future violation, EPA believes that the contingency measures set forth adequately balance the need for flexibility in the scope and type of measure to be implemented with the need for expeditious state action.

*Comment 5:* The Commenter asserts that the Ohio and Indiana Startup, Shutdown, Malfunction, and/or Maintenance provisions (SSM) are inconsistent with the Act and EPA policy because they provide that excess emissions are not violations. The Commenter also claims that the regulation is ambiguous because it lacks procedural specifications indicating whether it is to be interpreted as a "qualified exemption" or an "affirmative defense." In the second set of comments received, the Commenter asserts, "The Ohio and Indiana SIPs contain impermissible provisions governing startup, shutdown, malfunctions and scheduled maintenance."

*Response 5:* The CAA sets forth the general criteria for redesignation of an area from nonattainment to attainment in section 107(d)(3)(E). Specifically, that section identifies five criteria, including that "the Administrator has fully approved the applicable implementation plan for the area under section 7410(k) of this title." 42 U.S.C. 7407(d)(3)(E)(ii). Although the Commenter does not specifically cite to section 107(d)(3)(E)(ii), the language used in the comment ("fully approved adequate SIP") appears to derive from this section of the CAA (and the Commenter does later cite to section 107(d)(3)(E) in the concluding paragraph of the comment letter). As a preliminary matter, the issue before EPA in the current rulemaking action is a redesignation for the Ohio and Indiana portions of the Cincinnati-Hamilton area to attainment for the 1997 PM$_{2.5}$ standard, including the maintenance plan. The SIP provisions identified in the Commenter's letter are not currently being proposed for revision as part of the redesignation submittals. Thus, EPA's review here is limited to whether the already approved provisions affect any of the requirements for redesignation in a manner that would

preclude EPA from approving the redesignation requests. Because the rules cited by the Commenter are not pending before EPA and/or are not the subject of this rulemaking action, EPA did not undertake a full SIP review of the individual provisions. It has long been established that EPA may rely on prior SIP approvals in approving a redesignation request plus any additional measures it may approve in conjunction with a redesignation action. *See e.g.,* page 3 of the September 4, 1992, John Calcagni Memorandum; *Wall v. EPA,* 265 F.3d 426 (6th Cir. 2001); 68 FR 25413, 25426 (May 12, 2003).

Additionally, the comment inserted the word "adequate" into the phrase "fully approved SIP" (which is the language of Section 107(d)(3)(E)(ii)), such that the Commenter stated that Ohio and Indiana must have a "fully approved adequate SIP." Clearly the word "adequate" is not included in Section 107(d)(3)(E)(ii), and its inclusion substantially alters the plain text of the CAA. Furthermore, while the Commenter opines that the cited-to provisions of the Ohio and Indiana rules result in a "regulatory structure that is inconsistent with the fundamental requirement that all excess emissions be considered violations," Commenter does not link this concern with deficiencies in Ohio's and Indiana's redesignation submittals for the Ohio and Indiana portions of the Cincinnati-Hamilton area. There is no information in the comment indicating that Ohio or Indiana has excused violations and that such actions result in Ohio or Indiana failing to meet a requirement for redesignation. Furthermore, there is no information in the comment indicating that even if Ohio or Indiana were to excuse such violations that such violations would not be actionable by EPA or citizens. For Indiana's SIP, 326 IAC 1–6–4 was formerly codified as 325 IAC 1.1–5. When EPA approved that rule in 1984, it noted Indiana's clarification that any malfunction causing excess emissions would be treated as a SIP violation; and that the rule's criteria would be used in determining an appropriate enforcement response. (February 14, 1984, 49 FR 5618). This constitutes an "enforcement discretion" approach, acceptable under EPA's applicable policies. EPA also noted that it had independent authority under Section 113 of the CAA to determine whether enforcement discretion was an appropriate response in a particular case.

On June 30, 2011, Sierra Club filed a "Petition to Find Inadequate and Correct Several State Implementation Plans under Section 110 of the Clean

80258    **Federal Register** / Vol. 76, No. 247 / Friday, December 23, 2011 / Rules and Regulations

Air Act Due to Startup, Shutdown, Malfunction, and/or Maintenance Provisions". EPA has agreed to respond to this petition by August 31, 2012 as part of settlement of a lawsuit. *See Sierra Club et al.* v. *Jackson,* No. 3:10–cv–04060–CRB (N.D. Cal). At this time, with regards to the redesignation of the Ohio and Indiana portion of the Cincinnati-Hamilton area, EPA does not agree that the Commenter has raised a basis on which EPA could disapprove the redesignation. Ohio and Indiana have fully approved SIPs consistent with applicable requirements.

*Comment 6a:* The Commenter asserts that the Ohio SIP does not meet the requirement of section 107(d)(3)(E)(ii) because EPA has disapproved Ohio's "good neighbor provision" Section 110(a)(2)D)(i)(I).

*Response 6a:* The requirements applicable for purposes of redesignation are those which at a minimum are linked to the attainment status of the area being redesignated. As noted in the proposal (76 FR 64825), all areas, regardless of their designation as attainment or nonattainment, are subject to section 110(a)(2)(D). The applicability of this provision is not connected with nonattainment plan submissions or with the attainment status of an area. A nonattainment area remains subject to the requirements of section 110(a)(2)(D) after it has been redesignated to attainment. Therefore EPA has long interpreted the 110(a)(2)(D) requirements as not applicable requirement for purposes of redesignation. EPA has leeway to determine what constitutes an "applicable" requirement under section 107(d)(3)(E), and EPA's interpretation is entitled to deference. *Sierra Club* v. *EPA,* 375 F.3d 537 (7th Cir. 2004).

EPA has consistently interpreted only those section 110 requirements that are linked with a particular area's designation as the requirements to be considered in evaluating a redesignation request. See, *e.g.,* EPA's positions on the applicability of conformity, oxygenated fuels requirements for purposes of redesignations. See Reading, Pennsylvania, proposed and final rulemakings (61 FR 53174–53176, October 10, 1996, and 62 FR 24826, May 7, 1997); Cleveland-Akron-Lorain, Ohio, final rulemaking (61 FR 20458, May 7, 1996); and Tampa, Florida, final rulemaking (60 FR 62748, December 7, 1995). See also the discussion on this issue in the Cincinnati, Ohio 1-hour ozone redesignation (65 FR 37890, June 19, 2000), and in the Pittsburgh, Pennsylvania 1-hour ozone redesignation (66 FR 50399, October 19, 2001).

*Comment 6b:* The Commenter contends that the Ohio and Indiana SIPs do not have approved RACT rules.

*Response 6b:* EPA interprets RACT for $PM_{2.5}$ as linked to attainment needs of the area. If an area is attaining the $PM_{2.5}$ standard, it clearly does not need further measures to reach attainment. Therefore, under EPA's interpretation of the RACT requirement, as it applies to $PM_{2.5}$, Ohio and Indiana have satisfied the RACT requirement without need for further measures. On May 22, 2008, EPA issued a memorandum that clarified its position with respect to the relationship between $PM_{2.5}$ attainment and RACT requirements.

"Memorandum from William T. Harnett, Director, Air Quality Policy Division to Regional Air Division Directors, $PM_{2.5}$ Clean Data Policy Clarification." This memorandum explained that 40 CFR 51.1004(c) provides that a determination that an area that has attained the $PM_{2.5}$ standard suspends the requirements to submit RACT and RACM requirements.

Section 51.1010 provides in part: 'For each $PM_{2.5}$ nonattainment area, the state shall submit with the attainment demonstration a SIP revision demonstrating that it has adopted all reasonably available control measures (including RACT for stationary sources) necessary to demonstrate attainment as expeditiously as practicable and to meet any RFP requirements.'

Thus the regulatory text defines RACT as included in RACM, and provides that it is required only insofar as it is necessary to advance attainment. See also section 51.1010(b). The Commenter claims that *Wall* v. *EPA,* 265 F.3d 426, 442 (6th Cir. 2001), establishes that fully adopted RACT is nonetheless required. The Wall case, however, is not applicable to RACT requirements for the $PM_{2.5}$ standard. The Wall decision addressed entirely different statutory provisions for ozone RACT under CAA Part D subpart 2, which do not apply or pertain to the subpart 1 RACT requirements for $PM_{2.5}$.

*Comment 6c:* The Commenter asserts that the Ohio and Indiana SIPs lack $PM_{2.5}$ nonattainment New Source Review (NSR) programs. The Commenter also contends that the prevention of significant deterioration (PSD) program is part of the SIP that an area being redesignated needs to have to ensure that the area will stay in attainment. The Commenter takes the position that EPA cannot approve the redesignation requests because Ohio and Indiana do not have adequate $PM_{2.5}$ PSD programs. The Commenter bases its conclusion that Ohio and Indiana's PSD programs are inadequate for $PM_{2.5}$ on

the contention that the programs do not contain significant emission rates for $PM_{2.5}$ and its precursors, and that the programs do not include $PM_{2.5}$ increments.

*Response 6c:* Both Ohio and Indiana have approved nonattainment NSR programs in their SIPs. EPA approved Ohio's current NSR program on January 10, 2003 (68 FR 1366). EPA approved Indiana's current NSR program on October 7, 1994 (59 FR 51108). Nonetheless, since PSD requirements will apply after redesignation, the area need not have a fully-approved NSR program for purposes of redesignation, provided that the area demonstrates maintenance of the NAAQS without part D NSR. A detailed rationale for this view is described in a memorandum from Mary Nichols, Assistant Administrator for Air and Radiation, dated October 14, 1994, entitled, "Part D New Source Review Requirements for Areas Requesting Redesignation to Attainment." The memo states, "[EPA] * * * is establishing a new policy under which nonattainment areas may be redesignated to attainment notwithstanding the lack of a fully-approved part D NSR program, provided the program is not relied upon for maintenance." In this case, neither Ohio nor Indiana has relied upon NSR to maintain the standard.

Ohio and Indiana also each have an EPA approved PSD program that includes $PM_{2.5}$ as a NSR pollutant. While the Commenter is correct in stating that both Ohio and Indiana's approved PSD SIPs do not include specific significant emissions rates for $PM_{2.5}$ or its precursors, the Ohio and Indiana SIPs do include a provision that sets "any emission rate" as the significant emission rate for any regulated NSR pollutant that does not have a specific significant emission rate listed in the state rule. Under Indiana's rule, a regulated NSR pollutant includes a pollutant, for which a NAAQS has been promulgated, and constituents or precursors for the pollutants identified as a NAAQS by EPA.

Therefore, any increase in direct $PM_{2.5}$ emissions or emissions of its precursors ($SO_2$ and $NO_x$) will trigger the requirements to obtain a PSD permit; to perform an air quality analysis that demonstrates that the proposed source or modification will not cause or contribute to a violation of the $PM_{2.5}$ NAAQS; and to apply best available control technology (BACT) for direct $PM_{2.5}$ and/or the pertinent precursor.

In addition, the fact that Ohio's and Indiana's approved PSD SIPs lack $PM_{2.5}$ increments does not prevent the program from addressing and helping to

assure maintenance of the $PM_{2.5}$ standard in accordance with CAA section 175A. A PSD increment is the maximum increase in concentration that is allowed to occur above a baseline concentration for a pollutant. Even in the absence of an approved PSD increment, the approved PSD program prohibits air quality from deteriorating beyond the concentration allowed by the applicable NAAQS. Thus Ohio's and Indiana's approved PSD programs are adequate for purposes of assuring maintenance of the 1997 annual $PM_{2.5}$ standard as required by section 175A.

EPA notes that Indiana has adopted emergency rules containing significant emissions rates of 10 tons per year for direct $PM_{2.5}$ and 40 tons per year for sulfur dioxide and nitrogen oxide (as $PM_{2.5}$ precursors). The emergency rules also contain maximum allowable $PM_{2.5}$ increments of 4 micrograms per cubic meter ($\mu g/m^3$) for the annual standard and 9 $\mu g/m^3$ for the 24-hour standard.[4] The state is currently implementing the emergency rules at the state level and is in the process of adopting permanent rules for submission to EPA.

Irrespective of the state's emergency rules, EPA concludes that the features of Indiana's currently approved PSD program cited by the Commenter do not detract from the program's adequacy for purposes of maintenance of the standard and redesignation of the area. As it stands, the currently approved PSD program is sufficient for the purposes of maintaining the 1997 annual $PM_{2.5}$ NAAQS in the Cincinnati-Hamilton area.

## IV. Why is EPA taking these actions?

EPA has determined that the Cincinnati-Hamilton area has attained the 1997 annual $PM_{2.5}$ NAAQS. EPA has also determined that all other criteria have been met for the redesignation of the Ohio and Indiana portions of the Cincinnati-Hamilton area from nonattainment to attainment of the 1997 annual $PM_{2.5}$ NAAQS. See CAA section 107(d)(3)(E). The detailed rationale for EPA's findings and actions is set forth in the proposed rulemaking of October 19, 2011 (76 FR 64825) and in this final rulemaking.

## V. Final Action

EPA has previously made the determination that the Cincinnati-Hamilton area has attained the 1997 annual $PM_{2.5}$ standard (76 FR 60373). EPA is determining that the area continues to attain the standard and that

the Ohio and Indiana portions of the area meet the requirements for redesignation to attainment of that standard under section 107(d)(3)(E) of the CAA. Thus, EPA is approving the requests from Ohio and Indiana to change the legal designation of their portions of the Cincinnati-Hamilton area from nonattainment to attainment for the 1997 annual $PM_{2.5}$ NAAQS. EPA is approving Ohio's and Indiana's 1997 annual $PM_{2.5}$ maintenance plans for the Cincinnati-Hamilton area as revisions to the respective SIPs because the plans meet the requirements of section 175A of the CAA. EPA is approving the 2005 emissions inventories for primary $PM_{2.5}$, $NO_X$, and $SO_2$, documented in Indiana's and Ohio's December 9, 2010, and January 25, 2011, submittals as satisfying the requirement in section 172(c)(3) of the CAA for a comprehensive, current emission inventory. Finally, EPA finds adequate and is approving 2015 and 2021 primary $PM_{2.5}$ and $NO_X$ MVEBs submitted from each state for the Ohio and Indiana portions of the Cincinnati-Hamilton area. These MVEBs will be used in future transportation conformity analyses for the area after the effective date for the adequacy finding and approval.

In accordance with 5 U.S.C. 553(d), EPA finds there is good cause for this action to become effective immediately upon publication. This is because a delayed effective date is unnecessary due to the nature of a redesignation to attainment, which relieves the Area from certain CAA requirements that would otherwise apply to it. The immediate effective date for this action is authorized under both 5 U.S.C. 553(d)(1), which provides that rulemaking actions may become effective less than 30 days after publication if the rule—grants or recognizes an exemption or relieves a restriction, and section 553(d)(3), which allows an effective date less than 30 days after publication—as otherwise provided by the agency for good cause found and published with the rule. The purpose of the 30-day waiting period prescribed in section 553(d) is to give affected parties a reasonable time to adjust their behavior and prepare before the final rule takes effect. Today's rule, however, does not create any new regulatory requirements such that affected parties would need time to prepare before the rule takes effect. Rather, today's rule relieves the Ohio and Indiana of various requirements for the Ohio and Indiana portions of the Cincinnati-Hamilton area. For these reasons, EPA finds good cause under 5

U.S.C. 553(d)(3) for this action to become effective on the date of publication of this action.

## VII. Statutory and Executive Order Reviews

Under the CAA, redesignation of an area to attainment and the accompanying approval of the maintenance plan under CAA section 107(d)(3)(E) are actions that affect the status of geographical area and do not impose any additional regulatory requirements on sources beyond those required by state law. A redesignation to attainment does not in and of itself impose any new requirements, but rather results in the application of requirements contained in the CAA for areas that have been redesignated to attainment. Moreover, the Administrator is required to approve a SIP submission that complies with the provisions of the Act and applicable Federal regulations. 42 U.S.C. 7410(k); 40 CFR 52.02(a). Thus, in reviewing SIP submissions, EPA's role is to approve state choices, provided that they meet the criteria of the CAA. Accordingly, this action merely approves state law as meeting Federal requirements and does not impose additional requirements beyond those imposed by state law. For these reasons, these actions:

• Are not a "significant regulatory action" subject to review by the Office of Management and Budget under Executive Order 12866 (58 FR 51735, October 4, 1993);

• Do not impose an information collection burden under the provisions of the Paperwork Reduction Act (44 U.S.C. 3501 et seq.);

• Are certified as not having a significant economic impact on a substantial number of small entities under the Regulatory Flexibility Act (5 U.S.C. 601 et seq.);

• Do not contain any unfunded mandate or significantly or uniquely affect small governments, as described in the Unfunded Mandates Reform Act of 1995 (Pub. L. 104–4);

• Do not have Federalism implications as specified in Executive Order 13132 (64 FR 43255, August 10, 1999);

• Are not an economically significant regulatory action based on health or safety risks subject to Executive Order 13045 (62 FR 19885, April 23, 1997);

• Are not significant regulatory action subject to Executive Order 13211 (66 FR 28355, May 22, 2001);

• Are not subject to requirements of Section 12(d) of the National Technology Transfer and Advancement Act of 1995 (15 U.S.C. 272 note) because

**80260**    Federal Register / Vol. 76, No. 247 / Friday, December 23, 2011 / Rules and Regulations

application of those requirements would be inconsistent with the CAA; and,

• Do not provide EPA with the discretionary authority to address, as appropriate, disproportionate human health or environmental effects, using practicable and legally permissible methods, under Executive Order 12898 (59 FR 7629, February 16, 1994).

In addition, this final rule does not have tribal implications as specified by Executive Order 13175 (65 FR 67249, November 9, 2000), because the SIP is not approved to apply in Indian country located in the Commonwealth, and EPA notes that it will not impose substantial direct costs on tribal governments or preempt tribal law.

The Congressional Review Act, 5 U.S.C. 801 *et seq.*, as added by the Small Business Regulatory Enforcement Fairness Act of 1996, generally provides that before a rule may take effect, the agency promulgating the rule must submit a rule report, which includes a copy of the rule, to each House of the Congress and to the Comptroller General of the United States. EPA will submit a report containing this action and other required information to the U.S. Senate, the U.S. House of Representatives, and the Comptroller General of the United States prior to publication of the rule in the Federal Register. A major rule cannot take effect until 60 days after it is published in the Federal Register. This action is not a "major rule" as defined by 5 U.S.C. 804(2).

Under section 307(b)(1) of the CAA, petitions for judicial review of this action must be filed in the United States Court of Appeals for the appropriate circuit by February 21, 2012. Filing a petition for reconsideration by the Administrator of this final rule does not affect the finality of this action for the purposes of judicial review nor does it extend the time within which a petition for judicial review may be filed, and shall not postpone the effectiveness of such rule or action. This action may not be challenged later in proceedings to

enforce its requirements. (*See* section 307(b)(2)).

## List of Subjects

### 40 CFR Part 52

Environmental protection, Air pollution control, Incorporation by reference, Intergovernmental relations, Particulate matter.

### 40 CFR Part 81

Environmental protection, Air pollution control, National parks.

Dated: December 14, 2011.

**Susan Hedman,**

*Regional Administrator, Region 5.*

40 CFR parts 52 and 81 are amended as follows:

## PART 52—[AMENDED]

■ 1. The authority citation for part 52 continues to read as follows:

Authority: 42 U.S.C. 7401 *et seq.*

### Subpart P—Indiana

■ 2. Section 52.776 is amended by adding paragraphs (v)(3) and (w)(3) to read as follows:

**§ 52.776   Control strategy: Particulate matter.**

\*   \*   \*   \*   \*

(v) \* \* \*

(3) The Indiana portion of the Cincinnati-Hamilton nonattainment area (Lawrenceburg Township in Dearborn County), as submitted on December 9, 2010. The maintenance plan establishes 2015 motor vehicle emissions budgets for the Ohio and Indiana portions of the Cincinnati-Hamilton area of 1,678.60 tpy for primary $PM_{2.5}$ and 35,723.83 tpy for $NO_X$ and 2021 motor vehicle emissions budgets of 1,241.19 tpy for primary $PM_{2.5}$ and 21,747.71 tpy for $NO_X$.

(w) \* \* \*

(3) Indiana's 2005 NOx, directly emitted $PM_{2.5}$, and $SO_2$ emissions inventory satisfies the emission inventory requirements of section

172(c)(3) of the Clean Air Act for the Cincinnati-Hamilton area.

### Subpart KK—Ohio

■ 3. Section 52.1880 is amended by adding paragraphs (p) and (q) to read as follows:

**§ 52.1880   Control strategy: Particulate matter.**

\*   \*   \*   \*   \*

(p) Approval—The 1997 annual $PM_{2.5}$ maintenance plans for the following areas have been approved:

(1) The Ohio portion of the Cincinnati-Hamilton nonattainment area (Butler, Clermont, Hamilton, and Warren Counties), as submitted on January 25, 2011. The maintenance plan establishes 2015 motor vehicle emissions budgets for the Ohio and Indiana portions of the Cincinnati-Hamilton area of 1,678.60 tpy for primary $PM_{2.5}$ and 35,723.83 tpy for $NO_X$ and 2021 motor vehicle emissions budgets of 1,241.19 tpy for primary $PM_{2.5}$ and 21,747.71 tpy for $NO_X$.

(2) [Reserved]

(q) Approval—The 1997 annual $PM_{2.5}$ comprehensive emissions inventories for the following areas have been approved:

(1) Ohio's 2005 NOx, directly emitted $PM_{2.5}$, and $SO_2$ emissions inventory satisfies the emission inventory requirements of section 172(c)(3) for the Cincinnati-Hamilton area.

(2) [Reserved]

## PART 81—[AMENDED]

■ 4. The authority citation for part 81 continues to read as follows:

Authority: 42 U.S.C. 7401 *et seq.*

■ 5. Section 81.315 is amended by revising the entry for Cincinnati-Hamilton in the table entitled "Indiana $PM_{2.5}$ (Annual NAAQS)" to read as follows:

**§ 81.315   Indiana.**

\*   \*   \*   \*   \*

INDIANA $PM_{2.5}$
[Annual NAAQS]

| Designated area | | | | | Designation[a] | |
| | | | | | Date[1] | Type |
| --- | --- | --- | --- | --- | --- | --- |
| \* | \* | \* | \* | \* | \* | \* |
| Cincinnati-Hamilton, IN: Dearborn County (part) Lawrenceburg Township .................................. | | | | | 12/23/2011 | Attainment. |
| \* | \* | \* | \* | \* | \* | \* |

[a] Includes Indian Country located in each county or area, except as otherwise specified.
[1] This date is 90 days after January 5, 2005, unless otherwise noted.

Federal Register / Vol. 76, No. 247 / Friday, December 23, 2011 / Rules and Regulations    **80261**

| | | | | | Designation [a] | |
|---|---|---|---|---|---|---|
| Designated area | | | | | Date [1] | Type |
| * | * | * | * | * | * | * |
| Cincinnati-Hamilton, Ohio: | | | | | 12/23/2011 | Attainment. |
| Butler County ............ | | | | | | |
| Clermont County ............ | | | | | | |
| Hamilton County ............ | | | | | | |
| Warren County ............ | | | | | | |
| * | * | * | * | * | * | * |

§ 6. Section 81.336 is amended by revising the entry for Cincinnati-

Hamilton, OH in the table entitled "Ohio PM$_{2.5}$ (Annual NAAQS)" to read as follows:

§ 81.336  Ohio.

OHIO PM$_{2.5}$
[Annual NAAQS]

[a] Includes Indian Country located in each county or area, except as otherwise specified.
[1] This date is 90 days after January 5, 2005, unless otherwise noted.

[FR Doc. 2011-32818 Filed 12-22-11; 8:45 am]
BILLING CODE 6560-50-P

## ENVIRONMENTAL PROTECTION AGENCY

**40 CFR Part 63**

[EPA-HQ-OAR-2008-0080; FRL-9610-2]

RIN 2060-AR16

**National Emission Standards for Hazardous Air Pollutants: Area Source Standards for Prepared Feeds Manufacturing; Amendments**

AGENCY: Environmental Protection Agency (EPA).
ACTION: Direct final rule.

SUMMARY: The EPA is taking direct final action to revise certain provisions of the area source national emission standards for hazardous air pollutants (NESHAP) for prepared feeds manufacturing published on January 5, 2010 (final rule). These revisions will clarify the regulatory requirements for this source category and ensure that those requirements are consistent with the record. The revisions address the generally available control technology (GACT) requirements for pelleting processes at large, existing prepared feeds manufacturing facilities, specifically removal of the cyclone 95-percent design efficiency requirement, as well as associated requirements for compliance demonstration, monitoring, reporting, and recordkeeping; clarification of the requirement that doors be kept closed in areas where materials containing chromium and manganese are stored, used, or handled; and clarification of the requirement to

install a device at the point of bulk loadout to minimize emissions. These amendments are not expected to result in increased emissions or in the imposition of costs beyond those described in the January 5, 2010, final rule.
DATES: This direct final rule is effective on February 21, 2012 without further notice, unless the EPA receives adverse comment by January 23, 2012. If we receive adverse comment, we will publish a timely withdrawal in the Federal Register informing the public that this rule, or relevant provisions of this rule, will not take effect.
ADDRESSES: Submit your comments, identified by Docket ID No. EPA-HQ-OAR-2008-0080, by one of the following methods:
• Federal eRulemaking Portal: www.regulations.gov: Follow the instructions for submitting comments.
• Agency Web site: www.epa.gov/oar/docket.html. Follow the instructions for submitting comments on the EPA Air and Radiation Docket Web site.
• Email: a-and-r-Docket@epa.gov. Include Docket ID No. EPA-HQ-OAR-2008-0080 in the subject line of the message.
• Fax: Send comments to (202) 566-9744, Attention Docket ID No. EPA-HQ-OAR-2008-0080.
• Mail: Area Source NESHAP for Prepared Feeds Manufacturing Docket, Environmental Protection Agency, Air and Radiation Docket and Information Center, Mailcode: 2822T, 1200 Pennsylvania Avenue NW., Washington, DC 20460. Please include a total of two copies.
• Hand Delivery: EPA Docket Center, Public Reading Room, EPA West, Room 3334, 1301 Constitution Avenue NW., Washington, DC 20460. Such deliveries

are only accepted during the Docket's normal hours of operation, and special arrangements should be made for deliveries of boxed information.
Instructions: Direct your comments to Docket ID No. EPA-HQ-OAR-2008-0080. The EPA's policy is that all comments received will be included in the public docket without change and may be made available online at www.regulations.gov, including any personal information provided, unless the comment includes information claimed to be confidential business information (CBI) or other information whose disclosure is restricted by statute. Do not submit information that you consider to be CBI or otherwise protected through www.regulations.gov or email. The www.regulations.gov Web site is an "anonymous access" system, which means the EPA will not know your identity or contact information unless you provide it in the body of your comment. If you send an email comment directly to the EPA without going through www.regulations.gov, your email address will be automatically captured and included as part of the comment that is placed in the public docket and made available on the Internet. If you submit an electronic comment, the EPA recommends that you include your name and other contact information in the body of your comment and with any disk or CD-ROM you submit. If the EPA cannot read your comment due to technical difficulties and cannot contact you for clarification, the EPA may not be able to consider your comment. Electronic files should avoid the use of special characters, any form of encryption, and be free of any defects or viruses. For additional instructions on submitting comments,